# CIRCUIT COURT OF AUGUSTA COUNTY

Gail D. Fitzgerald
and Kirk D. Dedrick

v.

Sheila D. Harris *et al.*

June 27, 2012

Case No. CL06001278-00

By Judge Victor V. Ludwig

The case before the Court arises from a complaint for partition filed by Gail D. Fitzgerald and Kirk D. Dedrick against Sheila D. Harris, Dixie L. Dedrick (Dedrick),[1] and others, seeking partition of real property devised by Valda F. Dedrick as part of her estate (the Estate). In response to the complaint for partition, Dixie, "individually and as Executor of the Estate," moved for "aid and guidance in the completion of her administration of the" Estate, in part because the funds remaining in the Estate were insufficient for the satisfaction of claims, existing and potential.

The plaintiffs in the partition suit filed a demurrer to the counterclaim which does not appear ever to have been formally addressed. There is an order in the file, as to which Mr. Watkins gave notice of entry on January 29, 2007, dismissing the demurrer by agreement, but I cannot find that the order was entered. Nevertheless, on November 6, 2007, the Court entered an order requiring the issuance of process on additional parties as to "the complaint and counterclaim," from which I conclude that the demurrer was not pursued and was never sustained and that the case proceeded with both pleadings to be resolved. By the time I became responsible for the suit in 2008, that appeared to be the undisputed posture of the case.

The suit for partition, inextricably tied to the administration of the Estate, has been on going, with the most recent full hearing having been on August 9, 2011, with the last written information having been presented in January 2012, and the last appearance of the matter on the Court's docket having been in March 2012.

---

[1] There are many Dedricks in the case, but it is Dixie Dedrick who is the focus of much of the attention of the suit, and it is she who is the executrix of the estate of Valda F. Dedrick.

## A Lingering Issue of Attorney's Fees

Although I believe that I have put to rest the issue of Harris' claim against the Estate for attorney's fees expended in an earlier suit which was resolved by order of March 6, 2006, *Gail D. Fitzgerald et al. v. Dixie L. Dedrick, Executrix, et al.*, CH04000583, the still pending case has created sufficient ill-will that I do not want matters to be exacerbated by what might be perceived as a cavalier or thoughtless dismissal of those claims. The result is the same as I have already announced, so the loss of faith in the process may not be restored, but at least one cannot assert that the Court was entirely arbitrary or took the easy way with a knee-jerk reaction and called it black-letter law.

In the earlier suit, Fitzgerald alleged, *inter alia*, (a) that Harris was in possession of certain personal property belonging to the Estate (as to which the requested remedy is not clear), (b) that Harris and Dedrick had entered into a contract with the decedent regarding insurance proceeds (and maybe some breach of fiduciary duty), and (c) that Harris conspired with Dedrick to deny the beneficiaries of the Estate their rightful shares. Amended bill of complaint, CH04000583. The amended complaint prayed for an award of $100,000.00, joint and several, against Dedrick and Harris. Ultimately, the case was resolved on a motion to strike, a comment on the case's lack of merit, or, at least, on the presentation (perhaps the existence) of evidence to support it.

There does not appear to be any dispute that Harris significantly contributed to the defense of the claims, evidenced by the fact that, as Mr. Brannock observed, Judge Wood asked him to prepare the order disposing of it. However, it is inaccurate to assert that the Court views Harris only as a volunteer in the case; on the contrary, the Court is keenly aware that she was a party and exposed to liability, not as a representative of the Estate but in her own right. Although Harris might well have elected to permit Dedrick to take the lead, she also might have (and apparently did) elect, instead, vigorously to defend herself. To be sure, her efforts benefited Dedrick (and arguably the Estate) as well, but the *ad damnum* and prayer for relief touched Harris personally. In that posture, Harris did not act entirely altruistically; without her efforts, had there been any merit to the case, she might have suffered significant financial consequences separate and apart from Dedrick's or the Estate's exposure.

As Mr. Brannock acknowledges in his memorandum, *Willson v. Whitehead*, 181 Va. 960 (1943), does not "address a non-fiduciary . . . placed in [Harris'] position who is sued as a co-conspirator with an Executor." Harris Letter of September 13, 2011, page 3. Harris does cite *Dickenson v. Charles*, 173 Va. 393 (1939), in support of her claim, likening herself to a surety seeking reimbursement. However, although there may be an analogy, it is not persuasive. *Dickenson* surely stands for the proposition that "one secondarily liable on an obligation, such as a surety or an

accommodation endorser, who has satisfied the demands of the holder, is entitled to reimbursement from the party primarily liable," *id.* at 400, but Harris was not a surety for the Estate. In *Dickenson* (as is generally the case in which a surety is required to stand to his promise), there was no allegation that the surety had any liability other than one resulting from his having agreed to guarantee the principal's debt. But for the principal's failure to pay, the surety, who was active in executing the guaranty but passive otherwise, would have had no exposure. In the earlier case in this Court, however, no matter how baseless the claims may have been, it was not only the Estate (the debtor in Harris' analogy) but the surety (Harris, in her analogy) who was pursued, each for its (or her) own active part in the alleged wrong-doing.

Nor does *Colbert v. Priester,* 214 Va. 608 (1974), alter the analysis. In that case, Priester's spouse died intestate, owning the parties' residence. Because of her intestacy, the decedent's real estate passed by law to her children of a prior marriage, subject to Priester's curtesy interest. During the seven years following the death of Priester's wife, Priester and the Colbert children lived in the residence, and Priester paid the debt which was secured by it. The issue in the case was whether Priester should be reimbursed for the payment of that debt.

For its holding in *Colbert,* the Court relied on Code § 64.1-33, which permitted Priester to occupy the residence without charge until his curtesy was assigned, and on an earlier holding, *Simmons v. Lyles, Adm'r.,* 73 Va. (32 Gratt.) 752 (1880). In the *Simmons* case, the Court had concluded that the payment of a debt, during the period after the owning spouse's death but before the assignment of the dower interest, resulted in the surviving spouse's having a "right of substitution to the lien" of the lender. *Id.* at 764. In *Priester,* recognizing that, as was the case in *Simmons,* Priester was in possession of the residence pursuant to a right afforded him by statute and that his payment increased the value of the Colberts' inheritance, the Court concluded that Priester was entitled to reimbursement. Priester's right to occupy the residence was "a permissive possession that [could] be terminated whenever the [Colberts] elect[ed] to assign . . . curtesy." *Colbert,* at 607. He could have vacated the premises, leaving the residence encumbered by the debt, or he could elect to exercise his statutory right to remain, but he could do that only if he made the payments. Priester elected the latter course, with the result that he benefited both himself and the Colberts.

In the earlier case which this Court is addressing, it is not as though Harris elected to incur attorney's fees in order to enjoy a statutorily protected right, and, incidentally, to preserve the Estate. On the contrary, she likely had little choice but to defend herself, else she might have suffered considerable damage. Harris asserts that "equity adopts [subrogation] to compel the ultimate discharge of a debt by him who in good conscience ought to pay

it," *id.* at 608, and that is not only a good statement of law but a laudable one. Nevertheless, the issue is who, "in good conscience, ought to pay" for the defense of the earlier suit. Harris was in the cross-hairs of the suit as well as was the executrix, and each was at risk independently of the other.

In the final analysis, Harris' demand for a reimbursement of her attorney's fees is less a legally sustainable claim against the Estate than a justifiable criticism of the American system of leaving to the litigants the burden of their own legal costs. Without commenting on the merits of the earlier suit (because it was not on my watch),[1] however unfair it may be that the law of the Commonwealth does not permit Harris to recover her fees against the plaintiffs in the earlier suit, the injustice does not change or expand the law. Neither do the peculiar circumstances give to a court (at least not one which respects the separation of powers) the authority to do so; rather, it raises the prospect (and perhaps increases the odds) that the legislature may be persuaded to re-consider the common law as it is recognized and enforced in the Commonwealth and, by legislation, to curtail frivolous lawsuits by causing those who seek to gratify their own spite by questionable legislation carefully to consider the consequences to themselves.

Having articulated the basis for the Court's denial of an award of attorney's fees to Harris, to be funded by the Estate, arising from Harris' participation in the earlier suit, I now turn to the issue of the attorney's fees in the pending action.

By order of March 4, 2011, the Court acknowledged that it needed to determine (i) unpaid and allowable costs of the partition, including fees to be paid to the Special Commissioners and the attorney's fees, if any, (ii) amounts of unpaid and allowable claims against the estate, including attorney's fees incurred by the Estate and costs of administration advanced to the Estate and others, and (iii) amounts of the remaining costs of administration to settle the Estate. In addition, a certain class of judgment lien creditors were to file affidavits of their claims. As of the date of the hearing in August 2011, the amount held by the Special Commissioners was $108,753.00.

## Disposition of the Rest of the Case

In considering the issues before me, initially it seemed to me that there were two discrete matters: first, there were the claims against the Estate and the ultimate distribution of its net assets; and second, there was the partition suit and the allocation of proceeds after determining costs.

---

[1] It does not appear that Judge Wood thought much of the merits of the case, both based on his sustaining a motion to strike the evidence and on his comments in support of that decision. *See* DEx1.

The will left the real estate, two parcels, to Valda's living children and the descendants of any living child, and, with that language, the beneficiaries were Gail Fitzgerald, Harris, Kirk D. Dedrick, Dedrick, Lane Dedrick (living at the time the will spoke but since deceased, leaving his interest to Kimberly Boatner and Lane H. Dedrick, II), and another share to be divided among Carl E. England, Michelle R. Otto, and Cherry D. Bowie. The land was the subject of the partition suit, and, without more, that asset and that suit would need to be addressed separately from the Estate itself, except insofar as the assets of the Estate are insufficient to satisfy the liabilities of the Estate. In that posture, the Estate did have an interest in the partition suit, and Dedrick, as executrix, had an obligation to protect its interests in the property to be partitioned.

One parcel sold for $90,000.00 (confirmed by order of October 7, 2008), and the second parcel sold for $38,000.00 (confirmed by order of November 3, 2010). Indeed, that same order confirmed the sale of the second parcel for $70,000.00 to the husband of one of the plaintiffs, but, ultimately, that sale fell through when the purchaser revoked his offer because the advertisement had stated that there was a twelve-foot access easement, and, in fact, there was not. Even after the access issue was resolved, the offer was not renewed, so the process went on in a declining real estate market. It was this parcel that was the subject of a contentious hearing on August 19, 2010, when experts offered explanations as to how the value of the property ($90,000.00 in January 2008), declined, in part because of facts assumed that were inaccurate at the time of that appraisal and in part because the value of real estate generally precipitously declined after that date.

The representation at the hearing on August 9, 2011, was that the total available proceeds of the Estate and the partition suits was $108,753.00, a figure which can be confirmed only from an unmarked document showing the balance of checking account x2128 as of February 28, 2011, and a money market account x4617 as of July 29, 2011, perhaps intended as Claimant ExA but not marked as such. From that, I assume that the significant bulk of the Estate's assets are, in fact, the proceeds of the sale of the parcels in the partition suit. Hence, it seems to me that it makes little difference to attempt to parse out the claims arising from the partition suit separately from the claims against the Estate because the claims against the Estate would have to be paid prior to the distribution of proceeds from the partition suit.

A. *With Respect to Claims against the Estate (Arising Either as Standard Claims or Related to the Partition Suit, Inclusive of the Fees the Executrix Incurred in Joining in the Suit by Filing a Counterclaim)*

1. Claimant ExB reflects that Dedrick has advanced $15,067.76 (as of December 13, 2010) to the Estate for attorney's fees (through September 21, 2007), insurance, real estate taxes, fees to the Commissioner of Accounts, and miscellaneous costs, most of which have been approved by

the Commissioner of Accounts. I note that one of the advances, $1,000.00, was to cure the access problem to one of the parcels in the partition suit, and I further note that, of that, all of the parties agree that $500.00 was paid by Sheila Harris. Whether that is a loan by Harris to Dedrick or a loan by Harris to the Estate, Harris should recoup that amount. As to those which have not been presented to the Commissioner (and they are indicated on the exhibit), this Court approves them without the necessity of sending them for review of the Commissioner. One thing of which I am not certain, however, is whether any of the out of pocket expenses described in this item are also reflected in, or are redundant to, item 2.b or c below. If that is an issue, we can address it on yet another Motions Day.

2. *Attorney's Fees*

a. *Fees to Charles R. Ricketts*

There was no dispute that the fees to Mr. Ricketts were a proper claim against the estate, including the $512.50 which Dedrick advanced in conjunction while Mr. Ricketts represented her in the suit to remove the executrix (Case No. CL04000583). As I understand from Mr. Watkins' letter of August 16, 2011, all but the $512.50 has been paid. (*See* letter from Mr. Watkins, dated August 16, 2011.)

b. *Fees Claimed by Mr. Watkins for Representing Dedrick as Executrix Apart from the Suit To Remove Her as Executrix and the Partition Suit*

Mr. Watkins has submitted an itemization and summary reflecting 17.55 hours, for a total of $2,982.75, for representing Dedrick as executrix of the Estate and for representing her as executrix in the partition suit. The plaintiffs submit that Dedrick, as executrix, was not an owner of the property which was the subject of the partition suit, and the implication is that she is no different than other unrepresented parties. That transparent argument ignores the fact that she was a party to the suit by virtue of the counterclaim, the thrust of which was that the Estate needed representation, *inter alia,* in a suit to dispose of the only asset available to pay debts against the Estate. In addition, he is claiming $224.24 in costs advanced. Finally, Mr. Watkins represented that he is only billing time for which he has already been paid, leaving him to bear unrecovered fees of approximately $4,000.00, an act of generosity which the unrepresented litigants should appreciate. (*See* letter from Mr. Watkins, dated August 16, 2011.) Dedrick did suggest that the Estate likely will incur additional expenses of approximately $3,000.00 to do what is necessary to close it. The Court finds Mr. Watkins' fees to be reasonable.

### c. *Fees Claimed by Mr. Watkins for Representing Dedrick in the Suit To Remove Her as the Executrix (Case No. CL04000583)*

Mr. Watkins has submitted an itemization and summary reflecting 31.20 hours, for a total of $4,987.50, for representing Dedrick in the CH04000583 suit, to remove her as executrix of the Estate. I have considered the arguments of counsel regarding the propriety of assessing these fees against the Estate, and it appears that *Willson* controls the issue. Indeed, but for a lack of clear authority to do so, I would be inclined to assess a significant portion of those fees against the plaintiffs in that case, but it was ended before my time on the bench, without addressing that issue. The Court finds Mr. Watkins' fees to be reasonable

### d. *Fees Due to Dedrick for Services as the Executrix*

In this case, it is reasonable for Dedrick to be paid the standard commission of 5%. The Court approves the attorney's fees and the executrix's fee to Dedrick.

## B. *With Respect to the Partition Suit*

### 1. *Liens against the Properties*

The only lien against a beneficiary's interest in the property of which the Court is aware is the amount owing to the Department of Child Support Enforcement, and that attaches only to the interest of Lane Hamilton Dedrick, II. In a document filed February 16, 2012, the Department represented that a significant amount had been paid against its claim, "reducing its secured claim to $492.61, representing an interest debt of $12.61 and enforcement fees owed in the amount of $480.00." That, of course, must be paid prior to any distribution to the beneficiary.

### 2. *Attorney's Fees*

### a. *Fees Claimed by Ms. Paul*

Ms. Paul has submitted an itemization and summary reflecting 52.5 hours at $180.00 an hour, for a total of $9,526.00 in attorney's fees, for bringing and pursuing the partition suit. (PEx2.) Apparently, Ms. Paul's claim for attorney's fees would have been higher still if she had searched the title rather than leaving that to Mr. Watkins, as the parties acknowledged was the case. Having presided over this matter, the Court finds that a fee of $6,000.00 is reasonable.

### b. *Fees Claimed by Mr. Watkins*

Mr. Watkins has submitted an itemization and summary reflecting 13.85 hours, for a total of $3,518.75, for representing Dedrick as executrix of the Estate in the partition suit. In addition, he is claiming $700.00 as the initial appraisal fee which she advanced. The Court finds Mr. Watkins' fees to be reasonable.

### 3. *Special Commissioners' Fees*

#### a. *Fees Claimed by Ms. Paul*

Ms. Paul has submitted an itemization and summary reflecting 101.22 hours, for a total of $20,158.00, for time acting as Special Commissioner.

#### b. *Fees Claimed by Mr. Watkins*

Mr. Watkins has submitted an itemization and summary reflecting 60.30 hours, for a total of $11,798.50, for time acting as Special Commissioner.

#### c. *Fees Claimed by Mr. Brannock*

Mr. Brannock has submitted an itemization and summary reflecting 60.6 hours, for a total of $9,999.00, for time acting as Special Commissioner.

I certainly understand that the real estate had to be liquidated, both because it was not divisible in kind and because the proceeds of liquidation were necessary to enable the Estate to pay its obligations; still, any objective analysis of this suit leads to the conclusion that it could have been, to be charitable, more efficiently done. Couple that (a) with the prior suit in which the plaintiffs attempted to establish a conspiracy and to have the executrix removed (only to discover that the case rested on so slender a reed that it was struck) and (b) the amount of time that this Estate has been open and these suits have been pending, and one would be only a little hyperbolic to assert that the aggregation of these matters is a modern day (if abbreviated) mirror of Jarndyce v. Jarndyce. That, of course, is Charles Dickens' classic indictment of the chancery system that permitted the relentless prosecution of the suit to "drag its dreary length before the Court" and inexorably devour the entire proceeds of the inheritance at issue. To be sure, this Court must acknowledge a reluctant complicity in the disaster that is this case, but most of the inefficiency and unjustifiable expense was driven by spite and malice that resulted in unending sniping and an unnecessary bleeding of the very assets which Valda had hoped (would she had known some of her descendants better) her beneficiaries would enjoy.

Mr. Brannock, astutely (and accurately) recognizing that the perception of the integrity of the process is at risk, joined by Mr. Watkins, suggested that it would be appropriate for the Court not to award Commissioners'

fees in this case. The problem with following that suggestion is that the Court has an obligation to do substantial justice to everyone (to the extent that elusive goal is attainable in circumstances such as these), and to award no Commissioners' fees would mean that the attorneys would receive nothing for time which they had to expend in order to liquidate the property. The Court is aware that a 5% commission is standard, absent significant problems with the disposition of the property, but, in this case, of course, there were significant problems of various flavors.

Having reviewed the itemizations, I cannot, however, justify awarding all of the fees, and I cannot justify paying Ms. Paul an amount which is nearly equal to the combined total fees of the other two Commissioners. It is clear that, at times, the Commissioners, each charged with the same responsibility, found themselves at odds with each other and that, rather than its being a thoroughly cooperative effort, the exercise was, in many respects, an extension of an adversarial (sometimes nearly hostile) relationship. In the Court's judgment, that had an impact on the costs. Accordingly, the Court will award each Commissioner a fee of $7,000.00.